**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROBERT MARSHALL d/b/a MARSHALL REALTY, individually, and on behalf of all those similarly situated,, | : | **CASE NO.:** |
| Plaintiffs, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| INTEL CORPORATION, a Delaware corporation,, | : | |
| Defendant. | : | |

**CLASS ACTION COMPLAINT**

R. Bruce McNew, Esquire (# 967)
TAYLOR & McNEW, LLP
3711 Kennett Pike
Suite 210
Greenville, DE 19807

September 20, 2005

# TABLE OF CONTENTS


| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. JURISDICTION AND VENUE | 1 |
| III. THE PARTIES | 2 |
| A. Plaintiff | 2 |
| B. Defendant | 2 |
| 1. Intel | 2 |
| IV. CLASS ACTION ALLEGATIONS | 2 |
| V. FACTUAL BACKGROUND | 4 |
| A. MANUFACTURERS OF MICROPROCESSORS | 4 |
| 1. AMD HAS BEEN TRYING TO CATCH UP TO INTEL SINCE 1981 | 5 |
| 2. INTEL BREACHES ITS CONTRACT WITH AMD | 6 |
| B. INTEL HAS THWARTED ALL COMPETITION. | 7 |
| C. REGULATORY INVESTIGATION AND CHARGES | 10 |
| D. THE AMD LAWSUIT AGAINST INTEL | 12 |
| 1. BRIBES, THREATS AND OTHER ANTI-COMPETITIVE ACTS | 12 |
| E. INTEL'S ACTS HAVE DECREASED COMPETITION, DECREASED CONSUMER CHOICE, AND INCREASED PRICES | 18 |
| F. TOLLING OF THE STATUTE OF LIMITATIONS | 18 |
| JURY TRIAL DEMAND | 19 |

FIRST CLAIM FOR RELIEF

(Violation of 15 U.S.C. §§ 2 & 26; 28 U.S.C. § 2201 (a)) . . . . . . . . . . . . . . . . . . . . . 19

SECOND CLAIM FOR RELIEF

(Violation of California Business & Professions Code §§ 17000, *et seq.*)) . . . . . . . . 21

THIRD CLAIM FOR RELIEF

(Violation of California Business & Professions Code §§ 16700, *et seq.*)) . . . . . . . . 22

FOURTH CLAIM FOR RELIEF

(Violation of California Business & Professions Code §§ 17200, *et seq.*)) . . . . . . . . . 23

Plaintiff, individually and on behalf of all those similarly situated, alleges on information and belief, *inter alia*, based upon an investigation conducted by Plaintiff and its counsel, except as to those allegations pertaining to Plaintiff and its counsel personally, which are alleged based upon knowledge.

## I. INTRODUCTION

1. Although consumers and businesses have significant choices in computers--both in features and in cost, most computers contain the microprocessor, the microchips that operate the computer, of a single company: Defendant Intel Corporation ("Intel"). Advanced Micro Devices ("AMD") and other companies also sell microprocessors, but have never been able to obtain significant inroads with computer manufacturers and retailers.

2. The truth has recently emerged: Intel has engaged in unlawful practices, including cash payments, financial intimidation and secret rebates, to coerce computer manufacturers and retailers to purchase Intel products. Not only have Intel's profits soared as a result of its unlawful acts, but also consumers have been forced to pay higher prices, innovation has suffered and consumers have less choice--it is hard for them to find a computer without an Intel microprocessor.

## II. JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and § 1337(a), and 15 U.S.C. § 26. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and California Business & Professions Code § 16750(a). Intel is a resident of and performs

business in this District, and a substantial part of the events, acts, omissions and transactions complained of herein occurred in this District.

## III. THE PARTIES

### A. Plaintiff

5. Plaintiff Robert Marshall is an individual doing business as Marshall Realty, a real estate company which uses computers containing Intel microprocessors which were purchased in the San Francisco Bay Area. Robert Marshall resides in San Mateo County, California, and Marshall Realty has its principal place of business in San Bruno, California.

### B. Defendant

#### 1. Intel

6. Defendant Intel Corporation ("Intel") is a Delaware corporation with its principal place of business in Santa Clara, California. For over twenty years, it has dominated the microprocessor industry with a market share of almost continuously 80%. In 2004, its sales were $7.5 billion and its sales have continued to increase in 2005. Intel acted alone and also as part of a conspiracy with others to achieve the goal of Intel dominance in the microprocessor industry. Many acts were done in furtherance of the conspiracy to achieve its unlawful goal. Certain individuals and entities acted as the agent for Intel to advance and promote the conspiracy.

## IV. CLASS ACTION ALLEGATIONS

7. Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit on behalf of itself, and a class of persons and entities ("the Class") who purchased any product containing Intel microprocessors, other than for resale or distribution, during the last four years in California.

8. Excluded from the Class are: Defendants and their subsidiaries, successors, predecessors, present and former officers and directors, and members of their immediate families and any legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any excluded party.

9. This action is properly maintainable as a class action because it meets Rule 23 requirements for numerosity, commonality, typicality and superiority. The Class is numerous and spread across California thus making the joinder of all Class members impracticable. Though the exact number of members of the Class is unknown to Plaintiff at this time, the number of class members is numerous and can be readily determined from the sales records of retailers who sell products containing Intel microprocessors.

10. The following are questions of law and fact common to the class, which predominate over questions affecting individual members:

a. Whether Intel has engaged and is engaging in anticompetitive conduct;

b. Whether Intel is engaging in a combination or conspiracy to engage in anticompetitive conduct;

c. Whether Intel's acts violate 15 U.S.C. § 2;

d. Whether Intel's acts violate California Business and Professions Code §§ 17000 *et seq.*;

e. Whether Intel's acts violate California Business and Professions Code §§ 17200 *et seq.*;

f. Whether Intel's acts violate California Business and Professions Code §§ 16700 *et seq.*;

g. Whether Plaintiff and the Class have been damaged by Intel's anticompetitive acts, and, if so, the proper measure of damages to award Plaintiff and the Class; and

h. Whether Plaintiff and the Class are entitled to declaratory or injunctive relief.

11. Plaintiff's claims are typical of those asserted by the other Class Members and Plaintiff's interests are not adverse or antagonistic to the interests of the Class. Plaintiff will vigorously prosecute this action using the competent counsel it has retained. Plaintiff's counsel is experienced in class action antitrust litigation. Hence, Plaintiff is an adequate representative for the Class and will represent their interests fairly and adequately. Plaintiff does not anticipate any problem with managing this litigation as a class action.

12. The class mechanism is an efficient and fair method for adjudicating this action and is superior to other methods. The size of the Class would make other methods impracticable and without the use of the class mechanism, many individual Class members might not be able to afford or prosecute their individual claims.

## V. FACTUAL BACKGROUND

### A. MANUFACTURERS OF MICROPROCESSORS

13. Intel, AMD, VIA Technologies and Transmeta are the current producers of microprocessor chips which are used in personal computers and many other electronics products. Other former microprocessor manufacturers, including Rise Technology, Cyrix, National Semiconductor, IDT and Centaur, have gone out of business or been sold.

14. Intel has captured the dominant market share with AMD a close second. Other microprocessor manufacturers have not been able to achieve more than a de minimus market

share. Intel has been able to dominate the market even though its prices are higher and the other manufacturers have competitive products.

**1. AMD HAS BEEN TRYING TO CATCH UP TO INTEL SINCE 1981**

15. Until the 1982, there were few personal computers. That changed with the extraordinary success of the International Business Machines ("IBM") shipment in August of 1981 of its first personal computer using the Intel microprocessor. Intel was launched as a tremendously successful company and it never looked back.

16. Shortly after the success of the IBM personal computer, AMD was able to capitalize on this success because, at that time, IBM required that there be a "second source" for the chips it used in its computers to ensure an adequate supply. Thus, in February of 1982, Intel and AMD entered into a ten-year contract, which could be cancelled after five years. The preamble stated that the agreement was intended "to establish a mechanism for exchanging technical information so that each party acquires the capability to develop products suitable for sale as an alternate source for products developed by the other party."

17. The agreement provided that either company could elect to be a second source for products developed by the other party. In return for a royalty payment, the company developing the product would provide the other company with technical information and the licenses needed for it to make and sell the product. The contract specified an equation to be used to determine the value of the products.

18. Under the contract, AMD obtained second-source rights to Intel's 8086 chip and other specified products for cash. After 1985, AMD would have open access to Intel's products as long as Intel agreed to accept AMD product of sufficient value.

19. In 1984, the parties amended the contract wherein AMD obtained the second-source rights to Intel's 8016 and 80286, the successor to the 8086 and agreed to pay substantial royalties to Intel. If Intel accepted AMD products, then AMD was to have access to all of Intel's line of products without needing to pay royalties.

### 2. INTEL BREACHES ITS CONTRACT WITH AMD

20. By 1984, Intel, according to an arbitrator, began to extensively breach its obligations to act in good faith and fair dealing to AMD by trying to frustrate the contract because it wanted to be the sole source for its new chip, the 80386. For example, an October 1984 internal memorandum stated: "Assure AMD they are our primary source through regular management contact and formal meetings. [¶] Take no more AMD products under the current agreement."

21. Intel kept its intentions secret from the public and AMD and created the impression that AMD was to be the second source for the 80386. Intel was able to conceal its plan from AMD for about two years.

22. In April of 1987, AMD sought arbitration over Intel's breaches of the agreement. Thereafter, Intel gave notice of termination of the agreement. The arbitration lasted for four and one-half years and included 355 days of hearings.

23. By March of 1991, AMD began producing its own chip, the Am386, which it had reversed engineered from Intel's 80386 chip. The arbitrator found that AMD had delayed in producing its own chip and thus did not award AMD any lost profits from its inability to license Intel's 80386 chip.

24. The arbitrator, however, awarded AMD damages of $10 million, a permanent, non-exclusive and royalty-free license to any of Intel's intellectual property embodied in the AMD chip, (Am386) chip, a two-year extension to certain patents and copyright licenses related to the

Am 386, and other relief. The California Supreme Court affirmed the arbitrator's award in *Advanced Micro Devices v. Intel Corp.* (1994) 9 Cal. 4th 362.

25. After the resolution of the 1987 arbitration, Intel and AMD entered into another agreement, the exact terms of which are secret, which allows AMD to produce and sell microprocessors containing the microcodes of Intel's 80286, 80386, and 80486 and appears to allow for full cross-licensing of patents and some copyrights, without charge.

**B. INTEL HAS THWARTED ALL COMPETITION**

26. While the 1990s saw many microprocessor manufacturers introduce new chips, Intel continued to maintain its dominant market share. In the early part of the 1990s, AMD continued to clone Intel's microchips. In 1991, AMD introduced its Am386 followed by the Am486 in 1993. Both were very popular and sold for less than the comparable Intel chip. The AM386 chip sold more than one million units within the first year. Compaq and other large OEMs (Original Equipment Manufacturers, companies that customize computers and sell them under their own name) used the Am486.

27. In 1993, Intel released its Pentium CPU and then followed up with the Pentium Pro. In its 10-K filed with the Securities Exchange Commission for 1994, Intel said, "The Pentium® processor, introduced in 1993, ramped into high volume in 1994 and was the major factor in Intel's overall revenue growth from 1993 to 1994." Net revenue for 1994, according to the 10-K was $11,521,000.

28. In 1995, AMD responded by producing the K5, the first completely in-house AMD processor which was to compete with the Pentium which was followed by the K6. In January 1999, AMD released the 450 Mhz K6-III, the final iteration of the K6 series which directly competed with Intel's top of the line chips.

29. The K6 series was priced lower than the Intel chips, but the perception in much of the marketplace was that it did not perform as well as the Intel chips. Intel introduced a lower-priced Celeron chip, a version of its Pentium chip, to compete with AMD. This competition was good for computer prices because of the continuing innovation which made for better products.

30. Also in 1995, Transmeta was founded and started production of its microprocessors. Transmeta's entry into the market should have increased competition, but Transmeta has never been able to obtain a significant market share.

31. In 1999, Intel and AMD engaged in a price war which was good for competition. According to a March 22, 2000 C/Net News.com article:

> While less glamorous than Pentium IIIs or Athlons, the inexpensive chip lines for both companies remain crucial elements in their strategies. Celeron chips, which typically sell for $69-$180 in volume, account for roughly 35 percent of Intel's product mix, according to various estimates, and are incorporated in both corporate and consumer PCs. Until recently, AMD has relied on the budget K6-2 for the lion's share of its processor revenues. A market share slide for either company in this segment has typically been seen as a cause for alarm. Intel, for instance, began a scorched-earth pricing campaign in January 1999, after AMD gained a number of design wins with large computer makers such as Gateway. The ensuing price war sent AMD from profitability to three straight quarters of losses. Two other companies --National Semiconductor and IDT--were forced out of the market because of the price war.

32. In August of 1999, AMD introduced its Athlon (K7) processor which sent shock waves through the industry because of its excellent performance. In March of 2000, AMD announced the even more advanced Athlons.

33. Intel had trouble responding to these new AMD products. At the same time that AMD was introducing its new Athlons, Intel introduced its 1 Ghz Pentium, but was unable to ship it. AMD continued to be lower in price at the lower end of the chip market and it benefited from Intel's part shortages and yield problems. As a result of AMD's work, its market share, at one point, hit 23%, the highest it has ever reached. Intel, AMD, VIA Technologies and Transmeta kept refining and improving their microprocessors.

34. On September 29, 1999, Johan De Gelas in *Ace's Hardware* wrote in an article entitled "Is AMD Ready for the High-End/Server Market?":

> AMD has never been so close to Intel as it is now, the K6-III 450 can compete with the PIII-500 in business applications, and it is, in terms of clock speed right behind Intel. The fastest K6-2 clocks at 475 MHz, Intel's highest-clocked processor attains 500 MHz.
>
> Although AMD is capturing a big part of US retail market, and is making progress in the European retail market (an Intel stronghold), AMD investors can't really be happy since AMD makes no profits. AMD, who issued three profit warnings in the first quarter before posting a $128 million loss, is really testing the patience of its investors.
>
> Additionally, Intel's Celeron has successfully put the AMD's profit margins under great pressure, AMD is practically giving away their CPUs. The K7, however, should do much more than defend AMD's position, it should attack Intel's high margin, high-end market. Not only is the architecture of the K7 more advanced, the K7 is a deeply pipelined CPU, already running at 600 MHz using conventional cooling, higher than the fastest offering from Intel (PIII 550 MHz).

35. Transmeta also propelled Intel to be more innovative. According to a November 5, 2001 article in news.com, "Between January 2000–when Transmeta introduced the chip–and the delivery of Transmeta's first chips nine months later, Intel started work on a new line of energy-

efficient processors and began to promote them heavily with major computer makers such as IBM. [¶] Several PC maters, including IBM, Compaq Computer and Dell Computer, purchased Intel's low-power chips rather than Transmeta's. As recently as Tuesday, Sharp said it would stick with Intel's energy-efficient chips for its notebooks sold in the United States, although it sells a Transmeta notebook in Japan."

36. The market eagerly anticipated AMD's Opteron which was released in April of 2003. For example, on October 17, 2002, Johan De Gelas in *Aces Hardware* in an article entitled "More Details on AMD's Opteron," wrote:

> As you can see, the 2 GHz Opteron - if it were to be released today - would by far be the fastest processor in integer intensive tasks. The improved branch predictor and lower latency of the memory subsystem are probably the reasons why the 2 GHz Opteron is no less than 29% faster than a 2.25 GHz Athlon. We speculate that the 5.3 GB/s bandwidth is the main reason why the 2 GHz K7 FPU is now able to beat the Pentium 4 at 2.8 GHz, something it couldn't do in the Athlon XP.

37. As a result of AMD's introduction of Athlon and then Operon, AMD appeared poised to challenge Intel's dominance in the market in the new century. The actual results, however, did not meet these expectations.

38. According to AMD, its market share has only increased by 2% in the two years since Operon was launched. VIA Technologies and Transmeta have only been able to obtain small market shares. No matter what competitors did in terms of quality or price, Intel continued to dominate the microprocessor market.

**C. REGULATORY INVESTIGATION AND CHARGES**

39. On March 8, 2005, after a one-year investigation, the Japanese Fair Trade Commission ("JFTC") rendered an opinion that Intel's wholly owned subsidiary, Intel Kabushiki Kaisha ("IJKK") had substantially restrained competition in the market for CPUs sold to the five Japanese personal computer makers (Toshiba, Sony, NEC, Fujitsu and Hitachi). To stop these

illegal practices, the JFTC recommended that Intel notify its customers and employees that it may no longer provide rebates and other funds to Japanese computer manufacturers in exchange for conditions that exclude competitors' CPUs.

40. A March 14, 2005 article, "Intel Nailed for Antitrust in Japan" in *G2 Computer Intelligence* states: "Intel's problems began last April when the JFTC, in its usual dramatic fashion, raided three of Intel offices looking for evidence that the company was restraining its competition. It had reportedly cut deals, going back to 2002, with Hitachi, Sony, Fujitsu, Toshiba and NEC nosing out AMD and Transmeta. Sony and Fujitsu reportedly don't buy from AMD any more." As to market share, the article states: "AMD said that the JFTC found Intel did what it did in direct response to AMD's growing market share from 2000-2002 and that, as a result, AMD and Transmeta's combined market share fell from 24% in 2002 to 11% in 2003. Intel's share of the Japanese rose from 78% in 2002 to 90% in 2004."

41. In March of 2005, Intel's Japanese subsidiary, Intel KK agreed to abide by most of the conditions demanded by the JFTC. On March 31, 2005, Intel issued a press release, found at http://www.intel.com/pressroom/archive/releases/ 20050331corp.htm with the headline "Intel Agrees to Comply with JFTC Recommendation; Disagrees with Findings of Fact" announcing that its Japanese subsidiary agreed to accept the Recommendation from the JFTC. The acts of Intel's subsidiary are attributable to Intel who directed and endorsed these acts.

42. The European Commission is conducting its own separate inquiry into Intel's anticompetitive practices. The European Commission is looking into allegations that Intel abused its position in the market for Windows-capable microprocessors by engaging in abusive marketing practices and also that Intel used its dominant position in the chip marketplace to issue unfair royalty rebates and exclusive purchase agreements.

## D. THE AMD LAWSUIT AGAINST INTEL

### 1. BRIBES, THREATS AND OTHER ANTI-COMPETITIVE ACTS

43. On June 27, 2005, AMD filed a lawsuit in the District Court of Delaware, Case No. 05-441 alleging claims for antitrust violations against Intel. AMD in specific details discloses what it has learned from OEMs, retailers, distributors and others about Intel's non-competitive practices.

44. Intel has achieved its dominance not by fair competition, but by entering into exclusive and almost exclusive deals, punishing companies that do business with microprocessors other than Intel, offering secret discounts and rebates, and other non-competitive tactics. According to AMD's lawsuit, Intel's anticompetitive acts include:

a. Dell never used any microprocessor but Intel without providing a substantive reason. The reason that Dell sells exclusively Intel microprocessors is because of Dell's fear of financial retribution from Intel if it deals with Intel's competitors. It is for that reason alone that Dell only uses Intel's microprocessors.

b. Due to Intel's tactics, AMD is unable to enter into Fujitsu's commercial notebook lines and other notebook lines. In 2002, Fujitsu and AMD had formed an alliance to develop a low-power commercial notebook. AMD spent money in anticipation of the scheduled market release to occur in the first quarter of 2003. In early 2003, Intel offered incentives to Fujitsu in order to limit its dealings with AMD. Shortly before the launch of Fujitsu's commercial notebook, AMD was informed by Fujitsu that Intel would not allow Fujitsu to launch an AMD-powered commercial notebook. As a result, AMD's project died. In the summer of 2002, AMD was informed by Fujitsu that Fujitsu received pressure from Intel asking it to remove AMD-powered desktop websites from Fujitsu's website.

c. From 2001-2004, Gateway/e Machines was a substantial, if not exclusive, customer of Intel's microprocessors. AMD was informed by Ted Waitt, Gateway/e Machines' former CEO, that Intel offered him large sums not to do business with AMD. AMD was also informed by Gateway that Gateway has suffered retaliation from Intel for purchasing an insignificant amount of microprocessors from AMD.

d. In 2002, Hewlett Packard ("HP") requested that AMD provide it with $25 million quarterly as compensation for Intel's expected retaliation if HP purchased microprocessors from AMD. After some discussions, it was agreed that AMD would provide HP with its first million microprocessors free of charge. Upon knowledge of the agreement between HP and AMD, Intel exerted pressure on HP not to accept the microprocessors from AMD. As a result of Intel's acts, HP only took 160,000 free microprocessors from AMD. In addition, HP refused to carry an AMD-powered notebook. AMD was informed that Intel had paid HP an amount between $3-4 million to lock up the notebook market.

e. In early 2002, Hitachi was a substantial AMD customer. Thereafter, by mid-year of 2002, due to Intel entering into an exclusive-dealing arrangement with Hitachi, Hitachi has become a company selling exclusively Intel microprocessors.

f. In August 2000, IBM and AMD were in discussion regarding a proposed commercial PC business partnership. The negotiation was nearing completion in March 2001, when Intel offered IBM a "preferred supplier" deal where it would receive incentives for Intel being the exclusive supplier for microprocessors in commercial products. IBM accepted Intel's offer and consequently ended discussions with AMD. According to AMD, Intel also acted to frustrate AMD's efforts to enter into a partnership with IBM for servers. In April 2003, IBM cooperated with AMD as a "launch partner" for AMD's Opteron 64-bit server. However, IBM

substantially reduced its marketing after it received money from Intel to back off intensive marketing efforts for the Opteron.

g. AMC had almost 40% share of NEC's business of its microprocessors for notebooks and desktops in the first quarter of 2002. The situation changed dramatically in May of 2002, when Intel agreed to pay NEC more than 300 million yen (about $2.5 million U.S. dollars) per quarter in exchange for Intel receiving at least 90% of NEC's business in Japan and an unknown quota for worldwide business. NEC had not purchased microprocessors from AMD since the first quarter of 2003. AMD was informed by NEC that, in accordance with NEC's agreement with Intel, AMD's Japanese share has to stay in the single digits.

h. Prior to 2002, AMD had a 23% share of Sony's business. In 2002, AMD's share of Sony's business dropped to 8% and thereafter has had no business with Sony. In 2003, Sony canceled plans to release the AMD Athlon because Intel paid Sony a multimillion dollar sum disguised as discounts and promotional support in exchange for Sony's exclusive use of Intel microprocessors.

i. Prior to 2001, Toshiba had purchased a significant number of microprocessors from AMD. In 2001, Intel made a substantial payment to persuade Toshiba not to do business with AMD. Accordingly, Toshiba stopped doing business with AMD. AMD was informed by Toshiba executives that, provided that Toshiba did not use AMD's microprocessors, Toshiba would continue to receive tens of millions of dollars from Intel. In early 2001, Toshiba planned to use a Transmeta chip in its new laptop to be released in the United States. According to a November 5, 2001 article in news.com, "that would have represented a coup for the upstart chipmaker [Transmeta] in its rivalry with might Intel." However, Toshiba pulled the plug on the

notebook in the summer of 2001, ostensibly because of delays surrounding Transmeta's latest chip. It now appears Toshiba pulled the plug because of pressure from Intel.

45. In addition, Intel shut out competition by structuring its rebates to create a dealing arrangement that is almost exclusive. Intel sets the sales required for each company to receive quarterly rebates so high that the quota can only be met if almost all their sales are products that contain Intel microprocessors. A company does not receive any rebate if it does not meet its quota. Intel has set up other rebate programs directed at increasing the sales of its microprocessor, thereby accomplishing its anti-competitive goals.

46. Furthermore, according to AMD, Intel has made specific threats to companies that are interested in doing business with its competitors. The following are some examples:

a. Prior to 2003, Acer had committed to launch the AMD Athlon XP. In 2003, shortly before the launch of the AMD Athlon XP, Intel threatened that it would increase chipset prices on all Intel-based Acer systems by $10 if Acer awarded any processor business to AMD outside of Europe. As a result of Intel's actions, Acer aborted its efforts in launching the AMD Athlon XP.

b. According to Compaq's Chief Executive Officer, Michael Capellas, Intel withheld delivery of much needed server chips to Compaq because of the volume of business Compaq awarded to AMD.

c. In 2002, Intel threatened NEC that it would discontinue providing NEC with the technological roadmap for future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Thereafter, in 2002 and 2004, AMD microprocessors were not used in these NEC computers.

47. According to AMD, Intel also interfered with AMD's product launches by pressuring companies to withdraw their support for AMD products. For instance, Intel's then CEO, Craig Barrett, made a threat to Acer's Chairman, CEO and President at a time when Intel owed Acer $15-20 million in market development funds.

48. Barrett threatened that Acer would suffer drastic consequences if Acer supported AMD's launch of the Athlon64. As a result, Acer withdrew from the launch in the United States and Taiwan. It also canceled its promotional efforts, prohibited AMD's use of a video, and postponed its announcement of its Athlon64-powered computers. Acer's President subsequently reported to AMD that the only thing different about this message was that the messages usually came from "lower ranking managers" and not Intel's CEO.

49. Intel also uses product bundling to gain its competitive edge. Intel raises prices and achieves its anti-competitive goal by forcing OEMs to buy one product to obtain a more desirable product.

50. In addition, Intel has also targeted the distributors and retailers to whom the OEM sells the computers. Intel has entered into exclusive deals with multiple retailers around the globe by offering discounts, rebates and specialized programs designed to insure that almost all of the retailers' sales be of Intel product. For instance, until recently, Office Depot refused to sell AMD-powered notebooks because it feared loss of business from Intel. Fry's, another large retailer, received an offer by Intel to take Fujitsu's Athlon EX-based notebook off its shelves. Intel's competitors in Media Markt, Europe's largest computer retailer, have been prevented from competing with Intel completely as a result of payments by Intel of $15-20 million annually.

51. In the United Kingdom, Toys-R-Us uses Intel products exclusively. Dixon Services Group, operator of three major chains, made an agreement with Intel to keep non-Intel products at less than 10% of its business in exchange for payment from Intel. Despite Dixon Services Group did almost all of its business with Intel, it suffered retaliation from Intel for transacting a small amount of business with AMD.

52. Furthermore, Intel has paid substantial amounts of "market development funds" toward obtaining the best shelf space and paying for advertising, as is evidenced by the many computer ads which state: "Intel inside." Market development funds are often paid by manufacturers to retailers for shelf space for their products or for advertising. Such funds are a critical element of a retailer's choice of product.

53. As stated by an IDC personal computer analyst, the amount spent advertising sometimes totals 70% of a computer maker's ad budget. According to a 2002 White Paper, "The U.S. Aftermarket for Computer Accessories" prepared by Christopher Lanfear of Venture Development Corporation (4th ed. Jan. 2002), in the computer accessory market, retailers are reporting increased competition, which puts pressure on their margins. Their selection of computer accessories depends primarily on price followed by market development funds. The same analysis holds true for the manufacturers of microprocessors.

54. In addition, Intel has expended efforts to exclude competitors' technologies from being compatible with industry standards for its sole benefit. While industry groups work together to create an industry standard so that computer manufacturers can purchase components from more than one manufacturer, Intel has endeavored to have the industry association adopt standards on microprocessors that benefit Intel to the detriment of its competitors, but which provide no substantial benefit to customers.

## E. INTEL'S ACTS HAVE DECREASED COMPETITION, DECREASED CONSUMER CHOICE, AND INCREASED PRICES

55. As a result of Intel's conduct in acting alone, and its unnamed co-conspirators' assistance, competition in the microprocessor industry throughout the world has been decreased.

56. While consumer choice has also decreased, the prices paid by consumers like Plaintiff for computers and other products that use microprocessors have increased. This damage is continuing and will continue to occur.

57. The illegal acts of Intel have been a substantial factor in causing Plaintiff and the Class to pay higher prices for products containing microprocessors than they would have paid but for Intel's anti-competitive conduct. Plaintiff and each of the class members have been injured and financially damaged in their business and property in an amount to be determined according to proof.

58. Competition between Intel and AMD is important to the microprocessor industry. On August 27, 2004, InfoWorld Media Group stated: "Competition from AMD has reversed the trend of rising prices and stagnant innovation that characterizes a controlled market. AMD is responsible for $500 desktops, $1,200 rack servers and multigigahertz mainstream microprocessors, despite the fact that most of them have Intel's logo on them."

59. As explained by InfoWorld Media Group, it is important that competition be restored to the microprocessor industry. Otherwise, prices will increase again and innovation impeded.

## F. TOLLING OF THE STATUTE OF LIMITATIONS

60. Throughout the period set forth in this Complaint, Intel and its co-conspirators concealed Intel's unlawful conduct from Plaintiff and the Class. Intel's and the co-conspirators' acts were by their nature inherently self-concealing. Until the allegations of the JFTC and the

AMD complaint, Plaintiff and members of the Class had no knowledge of the illegal acts, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.

61. The affirmative actions of Intel and the co-conspirators heretofore alleged were concealed and carried out in a manner that precluded detection. Plaintiff and members of the Class could not have discovered the existence of the facts alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Intel and others to avoid detection.

62. As a result of the concealment of the illegal acts, Plaintiff and the Class assert the tolling of the applicable statute of limitations affecting the rights of action by Plaintiff and the members of the Class.

**JURY TRIAL DEMAND**

63. Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

**FIRST CLAIM FOR RELIEF**

**(Violation of 15 U.S.C. §§ 2 & 26; 28 U.S.C. § 2201(a))**

64. Plaintiff and the Class incorporate and reallege Paragraphs 1 through 63 as though fully set forth herein.

65. Intel has knowingly and wilfully monopolized, for twenty or more years, and continues to monopolize the microprocessor industry both acting alone and/or as part of a conspiracy and combination to monopolize with the unnamed co-conspirators. This conspiracy is between Intel and certain of its OEMs, distributors and/or retailers who have knowingly agreed with Intel to have Intel monopolize the microprocessor industry.

66. Because of its dominant market power, holding about 80% of the microprocessor market, Intel's actions have had a serious and detrimental impact on competition in the microprocessor market, to the injury of Plaintiff and the Class.

67. This course of conduct includes the following actions carried out both by Intel acting alone and also as part of the conspiracy:

a. Intel has entered into exclusive and near-exclusive deals with OEMs;

b. Intel has unlawfully imposed restrictions by product-line, channel or geography;

c. Intel has provided unlawful exclusionary rebates;

d. Intel has threatened financial retaliation to companies that do business with Intel's competitors;

e. Intel has interfered with AMD product launches; and

f. Intel has unlawfully engaged in product bundling.

68. Intel has intentionally and wrongfully created and maintained a monopoly in the microprocessor industry through anticompetitive actions in violation of 15 U.S.C. § 2 (Section 2 of the Sherman Act). As a result of these actions, competitors have been unnecessarily excluded from the marketplace and competition has decreased thereby increasing the price of the products containing microprocessors and decreasing choice.

69. Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure Rule 57, Plaintiff and the Class seek a declaration that Intel's actions are anticompetitive and have created and continue to create a monopoly in violation of 15 U.S.C. § 2.

70. Pursuant to 15 U.S.C. § 26 (Clayton Act § 16), Plaintiff and the Class seek equitable and injunctive relief to enjoin Intel from its conduct which has created an anticompetitive effect

in the microprocessor industry. Specifically, Plaintiff and the Class request that Intel be enjoined from: (a) entering into exclusive and near-exclusive deals with OEMs; (b) unlawfully imposing restrictions by product-line, channel or geography; (c) providing unlawful exclusionary rebates; (d) threatening financial retaliation to companies that do business with Intel's competitors; (e) interfering with competitors' product launches; and (f) unlawfully engaging in product bundling.

**SECOND CLAIM FOR RELIEF**

**(Violation of California Business & Professions Code §§ 17000, *et seq.*)**

71. Plaintiff and the Class incorporate and reallege Paragraphs 1 through 70 as though fully set forth herein.

72. Intel violated California's Unfair Practices Act, California Business & Professions Code §§ 17000 *et seq*. in that it engaged in unfair, dishonest, deceptive, destructive, fraudulent and/or discriminatory practices by which fair and honest competition was destroyed.

73. Intel's acts include, but are not limited to, secret payments and/or allowances in violation of California Business & Professions Code § 17045 and threats, intimidation and/or boycotts in violation of California Business & Professions Code § 17046.

74. Intel's unfair, dishonest, deceptive, destructive, fraudulent and/or discriminatory practices were a substantial factor in destroying and/or preventing fair and honest competition and, as a result, Plaintiff and the Class have been damaged. They have had to pay more for products containing microprocessors than they would have absent the illegal and anti-competitive conspiracy. These acts have caused and will continue to cause damages to Plaintiff and the Class in an amount to be proven at trial.

75. Pursuant to the Unfair Practices Act, Plaintiff and the Class are authorized to recover three times the damages it sustained plus reasonable attorneys' fees, costs and expenses. California Business & Professions Code § 17082.

76. In addition, the Court should enter a preliminary and permanent injunction enjoining Intel's wrongful conduct.

## THIRD CLAIM FOR RELIEF

**(Violation of California Business & Professions Code §§ 16700, *et seq.*)**

77. Plaintiff and the Class incorporate and reallege Paragraphs 1 through 77 as though fully set forth herein.

78. Intel and its unnamed co-conspirators violated California Business and Professions Code sections 16700, et seq. (the "Cartwright Act"), by forming one or more combinations to accomplish purposes prohibited by and contrary to the Cartwright Act. They engaged in an agreement, contract, combination, trust and/or conspiracy to create and maintain an Intel monopoly in the microprocessor market which artificially inflated the price for products containing microprocessors and limited the choices for consumers.

79. Intel and its unnamed co-conspirators committed acts that constituted prohibited conduct under the Cartwright Act, including but not limited to making illegal agreements among themselves to reduce competition and to raise the price of products containing microprocessors; carrying out restrictions in the microprocessor industry by limiting the companies which could purchase Intel's competitors' products to resell to Plaintiff and the Class, agreeing to illegal exclusive dealing arrangements, typing arrangements, rebates and discounts, and other such conduct. This conduct has unfairly and unlawfully increased the prices of products containing microprocessors and limited consumer choice.

80. The unlawful and unfair actions of Intel and its unnamed co-conspirators, which actions are continuing, were a substantial factor in causing injury to Plaintiff and the Class in their business or property. They have had to pay more for products containing microprocessors than they would have absent the illegal and anti-competitive conspiracy. These acts have caused and will continue to cause damages to Plaintiff and the Class in an amount to be proven at trial.

81. Also as a direct and legal result of the acts of Intel and the unnamed co-conspirators, Plaintiff and the Class were required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which it seeks recovery according to proof.

82. Pursuant to the Cartwright Act, Plaintiff and the Class are authorized to recover three times the damages it sustained plus interest and reasonable attorneys' fees, costs and expenses. California Business & Professions Code § 16750.

83. In addition, the Court should enter a preliminary and permanent injunction enjoining Intel's wrongful conduct.

**FOURTH CLAIM FOR RELIEF**

**(Violation of California Business & Professions Code §§ 17200, *et seq.*)**

84. Plaintiff and the Class incorporate and reallege Paragraphs 1 through 83 as though fully set forth herein.

85. Intel has engaged in unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.* because its conduct was fraudulent, unfair and/or illegal as herein alleged. Intel's conduct caused injury to Plaintiff and the Class.

86. As set forth above, Intel's business acts and practices, as alleged herein, constituted and constitute a continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of the Unfair

Competition Law. Intel's business acts and practices, as alleged herein, are continuing and have caused and will continue to cause Plaintiff and the Class to purchase the products containing microprocessors at artificially inflated prices and limited the choices available to them.

87. Plaintiff and the Class are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits, and such other relief that the court deems just in light of the ill gotten gains obtained by Intel as a result of such business acts or practices and enjoining Intel to cease and desist from engaging in the practices described herein.

WHEREFORE, Plaintiff and the Class pray for relief as follows.

a. For certification of a Plaintiff Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. For an injunction ordering Intel to cease and desist from engaging in the unfair, unlawful, and/or fraudulent practices alleged in the Complaint; including the following acts: (a) entering into exclusive and near-exclusive deals with OEMs; (b) unlawfully imposing restrictions by product-line, channel or geography;(c) providing unlawful exclusionary rebates; (d) threatening financial retaliation to companies that do business with Intel's competitors; (e) interfering with competitors' product launches; and (f) unlawfully engaging in product bundling under 15 U.S.C. § 26 and California law.

c. For a declaration pursuant to 28 U.S.C. § 2201(a) and Federal Rules of Civil Procedure Rule 57 that Intel's actions are anticompetitive and have created and continue to create a monopoly in violation of 15 U.S.C. § 2;

d. For damages, trebled, according to proof pursuant to California Business & Professions Code §§ 16750 and 17082;

e. For restitution according to proof pursuant to California Business & Professions Code § 17200.

f. For reasonable attorneys' fees;

g. For costs and expenses of the proceedings;

h. For prejudgment interest at the maximum legal rate; and

i. For such other and further relief as the Court deems proper.

Dated: September 20, 2005

TAYLOR & McNEW, LLP

R. Bruce McNew (# 967)
3711 Kennett Pike
Suite 210
Greenville, DE 19807
(302) 655-9200

Attorneys for Plaintiff Robert Marshall d/b/a Marshall Realty

OF COUNSEL:

COREY, LUZAICH, PLISKA
de GHETALDI & NASTARI LLP
Jerry E. Nastari
Dario deGhetaldi, Esquire
700 El Camino Real
P.O. Box 669
Millbrae, California 94030
Tel: (650) 871-5666
Fax: (650) 871-4144